IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BLANTON SIMS, | ) |
| *Plaintiff*, | ) ) ) ) No. 18 C 3842 |
| v. | ) ) Judge Virginia M. Kendall |
| MARLENE HENZE, GHALIAH OBAISI, as independent executor of the estate of SALEH OBAISI, et al. | ) ) ) ) |
| *Defendants*. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Blanton Sims believes he developed chronic nausea and dizziness from drinking discolored tap water in his prison cell. He claims the doctors who treated him, Dr. Saleh Obaisi and Dr. Marlene Henze, were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, because they neither ruled out the water in Sims's cell as the cause of his symptoms nor prescribed him free bottled water from the prison commissary. Defendants now move for summary judgment. (Dkt. 135). For the following reasons, the motion is granted.

## BACKGROUND

**A.   Sims's Illness and Medical Treatment**

Blanton Sims is an inmate at the Stateville Correctional Center within the Illinois Department of Corrections (IDOC). (Dkt. 144 ¶ 2). For over ten years, Sims observed "brownish yellow" water coming from the faucet in his cell. (Dkt. 146 ¶ 1; Dkt. 143-1 at 14). This happened two or three days per week, sometimes for "10 to 25 minutes," in Sims's estimation. (Dkt. 146 ¶ 1; Dkt. 143-1 at 12). Occasionally, Sims drank the brownish-yellow water in his cell, although he has

1

tried to avoid doing so. (Dkt. 146 ¶ 1; Dkt. 143-1 at 14). Sims believes that drinking the water has made him feel nauseous and dizzy. (Dkt. 146 ¶ 2; Dkt. 143-1 at 14).

In 2014, Sims began suffering from "nausea, dizziness, vertigo, vomiting, diarrhea, and abdominal pain." (Dkt. 144 ¶ 8). He sought treatment from Dr. Saleh Obaisi, who was Stateville's Medical Director from 2012 until he died in December 2017,[1] and later, Dr. Marlene Henze, who took over as the Medical Director in October 2018. (Dkt. 144 ¶¶ 3–4, 12, 23–24). A summary of Sims's medical history follows: On April 26, 2014, Sims complained to a nurse at Stateville that he felt dizzy and nauseous after eating. (Dkt. 146 ¶ 3; Dkt. 143-2). According to the nurse's notes, Sims was "educated to stay away from foods that cause nausea." (Dkt. 143-2). One month later, on May 28, 2014, Sims saw Dr. Obaisi for nausea and vomiting. (Dkt. 146 ¶ 4).[2] On October 10, 2014, Sims returned to the Wexford Clinic complaining of vomiting. (Dkt. 146 ¶ 5; Dkt. 143-3). Twelve days later, on October 22, 2014, Sims complained of dizziness and vertigo to a nurse, who advised him to drink more water. (Dkt. 146 ¶ 5; Dkt. 143-4).

On February 23, 2016, Sims returned to the clinic complaining of nausea, vomiting, and dizziness, and a physician assistant diagnosed him with vertigo, left upper extremity radiculopathy, and right upper extremity radiculopathy. (Dkt. 146 ¶ 5; Dkt. 143-5). On May 15, 2016, Sims saw a nurse, complaining: "I'm still having dizzy spells like before and I work heavy machinery and need to see [the physician assistant] again. I also drank the water, which is yellow." (Dkt. 146 ¶ 6; Dkt. 143-6). Three days later, on May 18, 2016, Sims saw the physician assistant, who diagnosed him with unresolved "abdominal discomfort" and vertigo. (Dkt. 146 ¶ 6; Dkt. 143-7).[3]

---

[1] Defendant Ghaliah Obaisi is the executor of Dr. Obaisi's estate. (Dkt. 144 ¶ 4).
[2] According to Sims, he told Dr. Obaisi that he began feeling sick after he ate scrambled eggs and "drank the water." (Dkt. 143-1 at 15–16). A record of treatment from that day notes Sims's report of eating scrambled eggs but does not mention the water. (Dkt. 146-1).
[3] Although Sims states that he saw Dr. Obaisi on May 18, 2016, the notes from the visit say "PA note," and the handwriting appears identical to the visit notes from February 23, 2016, when Sims saw the physician assistant.

2

On May 26, 2016, Dr. Obaisi diagnosed Sims with chronic sinusitis and sent him for several tests: a complete blood panel, a complete metabolic panel, and an x-ray of his facial sinus. (Dkt. 144 ¶ 17; Dkt. 136-8 at 10). Dr. Obaisi prescribed the medications Prednisone and Keflex for Sims on June 8, 2016, and he renewed the prescriptions on October 11, 2016. (Dkt. 144 ¶ 18). On October 29, 2016, Dr. Obaisi conducted a physical exam based on Sims's complaints of vertigo, finding his sense of balance was normal and he had no nystagmus. (*Id.* at ¶ 19; Dkt. 136-8 at 11–12). Dr. Obaisi saw Sims again on November 8, 2016; he noted that the Prednisone controlled Sims's vertigo, and he prescribed Claritin. (Dkt. 144 ¶ 20). One week later, Dr. Obaisi referred Sims to see an ear, nose, and throat (ENT) specialist, noting that he had prescribed additional medications, Beta blocker, Procardia, and Antivert. (*Id.*; Dkt. 136-8 at 12). Seeing Sims again on December 22, 2016, Dr. Obaisi noted that the Claritin helped Sims's sinus congestion, while the Prednisone helped the vertigo. (Dkt. 144 ¶ 21; Dkt. 136-8 at 12–13).

On February 15, 2017, Sims visited the physician assistant, who noted: "same chronic complaints of vertigo, states he has episodes of lightheadedness, vertigo, head pains sharp off/on – new, blurry vision new intermittent. Still working, hasn't interrupted work. None of the meds are helping. I take them all. I feel pressure behind my eyes." (Dkt. 146 ¶ 7; Dkt. 143-8). One week later, on February 22, 2017, Dr. Obaisi evaluated Sims and noted that his "vertigo is severe. Not responding to meds." (Dkt. 146 ¶ 7; *see also* Dkt. 136-8 at 13).[4] Dr. Obaisi referred Sims for a neurology evaluation based on his "chronic recurrent vertigo." (Dkt. 146 ¶ 7; Dkt. 146-13). Then, on April 26, 2017, Sims saw the ENT specialist at the University of Illinois Chicago (UIC) based

---

(*Compare* Dkt. 143-7, *with* Dkt. 143-6). There is no evidence on the record supporting Sims's assertion that he saw Dr. Obaisi on May 18.

[4] Disputing Sims's characterization of Dr. Obaisi's February 22, 2017 visit notes, Defendants assert that Dr. Obaisi noted Sims's subjective complaint, rather than his own assessment. (Dkt. 146 ¶ 7). Although the Court granted Defendants' request to file an exhibit containing Sims's medical records, including the visit notes, under seal, (Dkts. 138, 139), from the Court's review of the record, Defendants have not filed that exhibit. Nonetheless, the parties agree that Sims saw Dr. Obaisi on February 22, and Dr. Obaisi's notes included the above-quoted language.

on Dr. Obaisi's referral. (Dkt. 144 ¶ 22; Dkt. 136-8 at 14). The ENT noted that the cause of Sims's vertigo symptoms could have been a vestibular migraine; the specialist recommended a video nystagmography (VNG) test, and if that testing proved normal, a neurology consultation. (Dkt. 144 ¶ 22; Dkt. 136-8 at 14). On May 2, 2017, Dr. Obaisi approved the referral for the VNG. (Dkt. 144 ¶ 22).

Sims had evaluations with medical providers at the clinic on May 15 and June 20, 2017, and his medication was renewed. (*Id.* at ¶ 23). On July 30, 2017, Sims told a nurse that he "need[ed] to see Dr. Obaisi" regarding upcoming appointments. (Dkt. 146 ¶ 8; Dkt. 143-10). He also showed the nurse "a bottle with yellow liquid in it stating that it was water from his sink and it's making him sick but don't know why." (Dkt. 146 ¶ 8; Dkt. 143-10). There is no record that Sims saw Dr. Obaisi between July 30 and August 14, 2017, when Sims filed a grievance about Dr. Obaisi's treatment. (Dkt. 146 ¶ 9).

On October 17, 2017, while his grievance was pending, Sims saw a neurologist at UIC based on Dr. Obaisi's referrals. (Dkt. 144 ¶ 24; Dkt. 146 ¶ 21; Dkt. 143-13). According to the neurologist, the cause of Sims's symptoms was unclear, "but likely possibilities are peripheral etiology (inner ear), central cause (posterior circulation) or associated with migraine." (Dkt. 144 ¶ 24; Dkt. 136-8 at 16). The neurologist recommended further testing—including an MRI and MRA—which Dr. Obaisi approved; Sims underwent the tests on November 9, 2017, which came back normal. (Dkt. 144 ¶ 25; Dkt. 136-8 at 16–17). Sims returned to UIC on November 21, 2017 for the VNG testing, which indicated "[a] right unilateral weakness . . . suggestive of a peripheral dysfunction." (Dkt. 144 ¶ 26; Dkt. 136-8 at 17). The specialist recommended that Sims follow up with the ENT and "consider vestibular rehabilitation with physical therapy due to symptoms of dizziness." (Dkt. 144 ¶ 26; Dkt. 136-8 at 17). When Sims returned to the ENT on November 27,

4

2017, he received a diagnosis of vestibular dysfunction of the right ear and a recommendation for physical therapy. (Dkt. 144 ¶ 26; Dkt. 136-8 at 18).

Dr. Obaisi saw Sims for the last time on November 28, 2017; the doctor renewed Sims's medications and sent him to physical therapy for his vestibular dysfunction. (Dkt. 144 ¶ 27; Dkt. 146 ¶ 21; Dkt. 136-8 at 18). Two days later, when Sims began physical therapy, he complained to the physical therapist that he had vertigo symptoms "from drinking contaminated water." (Dkt. 144 ¶ 27; Dkt. 143-14; Dkt. 136-8 at 18–19). Sims went back to UIC for a neurology follow-up appointment on December 6, 2017. (Dkt. 144 ¶ 28; Dkt. 136-8 at 19). The neurologist observed that Sims's chronic vertigo was "likely vestibular in etiology," recommending that Sims continue with physical therapy. (Dkt. 144 ¶ 28; Dkt. 136-8 at 19). Sims's physical therapy continued until February 28, 2018. (Dkt. 144 ¶ 29). In his second-to-last visit, the physical therapist noted that Sims "has not been observed by this author to vomit or stagger or display nystagmus." (*Id.*; Dkt. 136-8 at 20).

Dr. Henze began working at Stateville on October 8, 2018. (Dkt. 144 ¶ 30; Dkt. 136-1 at 4). When Sims next followed up with the neurologist at UIC, Sims told the neurologist that he felt the vestibular therapy did not help; he did not want to return to physical therapy or the ENT specialist. (Dkt. 144 ¶ 30; Dkt. 136-8 at 21–22). The neurologist recommended that Sims see a headache specialist due to potential vestibular migraine. (Dkt. 144 ¶ 30; Dkt. 136-8 at 22). Dr. Henze saw Sims for the first time on November 21, 2018; she noted his medical history—including his receipt of medications Antivert and Reglan and Dr. Obaisi's note that he had "exhausted treatment options onsite"—and approved the referral to UIC's headache clinic. (Dkt. 144 ¶ 31; Dkt. 136-8 at 22).

5

In a November 28, 2018 follow-up appointment, Dr. Henze renewed Sims's Reglan prescription and prescribed a multivitamin. (Dkt. 144 ¶ 32; Dkt. 136-8 at 22). On December 16, 2018, Dr. Henze prescribed Sims new medications, including Zyrtec, and she ordered a lead test. (Dkt. 144 ¶ 32; Dkt. 136-8 at 22–23). Sims went to the UIC headache clinic on April 22, 2019, where a headache specialist observed that the cause of Sims's vertigo was unclear; the specialist recommended the medication Amitriptyline, which Dr. Henze prescribed for Sims the next day. (Dkt. 144 ¶ 33; Dkt. 136-8 at 24).

In her deposition, Dr. Henze testified that she was under the impression—based on a conversation with the Warden at Stateville—that she could not prescribe Sims bottled water from the commissary under a prison policy established in late 2018. (Dkt. 144 ¶ 36; Dkt. 136-1 at 9).[5] Apart from Sims, no other inmates ever complained to Dr. Henze that drinking water at the prison was causing or exacerbating their symptoms. (Dkt. 144 ¶ 15; Dkt. 136-1 at 10). Nor has anyone told Dr. Henze to avoid drinking the water at Stateville. (Dkt. 144 ¶ 15; Dkt. 136-1 at 10). Dr. Henze believed that inmates could purchase up to 36 bottles of water from the commissary each month. (Dkt. 144 ¶ 16; Dkt. 136-1 at 12). Sims testified that he could drink two juices every day at lunchtime and unlimited milk at dinnertime. (Dkt. 144 ¶ 16; Dkt. 136-7 at 6).

Sims's retained medical expert, Dr. Finley Brown, has asserted that Dr. Obaisi's and Dr. Henze's treatment of Sims was lacking, opining that "[c]ontaminated water could have caused or exacerbated Sims's symptoms and easy steps could have been taken to determine whether or not that was the case." (Dkt. 136-9 at 10–11; *see also* Dkt. 136-10 at 14, 16). According to Dr. Brown,

---

[5] Sims objects that the Warden's out-of-court statement to Dr. Henze is inadmissible hearsay—ignoring that Defendants do not rely on the statement for its truth. *See* Fed. R. Evid. 801(c)(2) (defining "hearsay" as a statement offered "to prove the truth of the matter asserted."). Of course, the Warden's statement is admissible to show that it informed Dr. Henze's understanding that Stateville policy disallowed prescribing bottled water. *See Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) ("Statements introduced to show their effect on the listener, rather than the truth of the matter they assert, are not hearsay.").

"[s]ome patients are more susceptible to contaminates than others, and patients experiencing persistent vertigo or nausea may be more likely to experience vomiting and stomach pain from drinking foul smelling water than others." (Dkt. 136-9 at 11).

On the other hand, Defendants' retained expert, Dr. Thomas Fowlkes, has stated that Sims received "exemplary" care. (Dkt. 136-8 at 26). Dr. Fowlkes has found the cause of Sims's symptoms to be unclear—evidenced by "multiple providers' differential diagnoses and the varied attempts to formulate a differential diagnosis, much less to pinpoint the exact cause of his symptoms." (*Id.* at 26–27). Nonetheless, in Dr. Fowlkes's view, Sims's "symptoms are not consistent with a water-borne illness," because multiple blood tests "showed no evidence of bacterial or protozoan gastrointestinal infection," Sims "had no significant lead in his system," and "[t]here is no evidence of malnourishment" or weight fluctuation. (*Id.* at 28–29).

**B.     Sims's Grievance**

On August 14, 2017, Sims filed a grievance with the IDOC, complaining about his medical treatment:

> Starting from 2013 I have been having problems with nausea and vertigo (dizziness). It's been recurrent since 5/28/14, when I went to E.R. for severe vomiting and dizziness. After eating breakfast the morning of 5/28/14 and drinking brownish-yellow water out of the sink faucet (cell) . . . I went to the E.R. and was put on a IV of lactated ringer of 1000cc by Dr. Obaisi and given Bentyl 40mg. . . . On 8-5-14, I was given Prilosec 20mg by Dr. Obaisi for nausea and vomiting . . . only to come back again 10-10-14 for vomiting again. And I was given the same Prilosec 20mg. . . . I was back again 10-24-14 with more nausea, vomiting and dizziness . . . . With this recurrent nausea and dizziness I was seen again 2-23-16 and 3-15-16 by Dr. Obaisi . . . . Then I was put on Meclizine 25mg and Antivert, all of which did nothing but made me drowsy. . . .
>
> Dr. Obaisi thought it was my sinuses and gave me Prednisone and Keflex [on] 6-18-16, which only made my pre-existing condition hide and slowed my sinuses some. But the nausea and vertigo returned. And again on 10-11-16 did Dr. Obaisi give me Prednisone and Keflex . . . .

> So at the end of 2016 around or between October to December, I asked Dr. Obaisi for a MRI, only to be told the MRI was denied. After all this meds and some others like Simethicone and Protonox and nothing has worked, then something else must be wrong. . . . So now we're trying other test with the ear doctor at UIC Chicago. . . . Now I'm still waiting for the follow-up appointment for another ear-eye test. All in all I'm still no closer to finding out what's wrong and . . . Dr. Obaisi said it's up to them. Who is them, Wexford, UIC Chicago, or what?
>
> With this constant dizziness (vertigo) and nausea feeling daily, has cause for concern that something is really wrong, even with shooting pains and blurred vision and nothing to help me, is a continuing violation of my rights to medical treatment.

(Dkt. 146 ¶ 10; Dkt. 143-11 at 2–3). Sims requested "to see a specialist and neurologist or get MRI to find out why the nausea and vertigo or whatever is not responding to meds." (Dkt. 143-11 at 2).

On August 28, 2017, a grievance counselor responded that Sims's grievance was untimely: "The grievance states that the MRI was denied in 2016." (Dkt. 143-11 at 2). Then, on November 2, 2017, a grievance officer denied Sims's medical-treatment grievance, explaining that Sims "appears to be receiving proper medical treatment." (Dkt. 146 ¶ 16; Dkt. 143-12). "After reviewing the offender's medical record," the grievance officer found that Sims "has been seen several times regarding these issues and has upcoming appointments with outside providers." (Dkt. 143-12). On November 6, 2017, the Warden concurred with the grievance officer's denial. (Dkt. 146 ¶ 17; Dkt. 143-12). Sims appealed the grievance denial to the Administrative Review Board (ARB). (Dkt. 146 ¶ 19; Dkt. 143-12; Dkt. 146-1 at 2). The ARB received the appeal on December 4, 2017, and the next day, affirmed the denial due to Sims's failure to timely file the grievance within 60 days of the complained-of conduct. (Dkt. 146 ¶ 20; Dkt. 146-1 at 2); *see* 20 Ill. Admin. Code § 504.810(a).

**C.     Procedural History**

Sims filed this lawsuit in June 2018, (Dkt. 1), and amended his complaint in August 2018, (Dkt. 6), and again in March 2019, naming Stateville's current and former wardens and chief

8

engineers (collectively, the Stateville Defendants), the executor of Dr. Obaisi's estate, Dr. Henze, and two John Doe Defendants (collectively, the Wexford Defendants), (Dkt. 26 ¶¶ 5–13). In his Second Amended Complaint, Sims brought two Eighth Amendment deliberate-indifference claims under 42 U.S.C. § 1983, alleging that (1) the Stateville Defendants deprived him of access to clean drinking water (Count I); and (2) the Wexford Defendants failed to adequately treat his chronic illness. (Dkt. 26 ¶¶ 59–80). In August 2021, Sims and the Stateville Defendants stipulated to the dismissal of Count I, leaving behind Count II. (Dkts. 111, 113). On September 8, 2022, this case was reassigned to this Court from the Honorable John Z. Lee. (Dkt. 134). Henze and Obaisi now move for summary judgment on Sims's remaining claim. (Dkt. 135).

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). At this stage, the Court construes the facts and draws reasonable inferences in the nonmovant's favor. *Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022) (quoting *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022)).

## **DISCUSSION**

In his sole remaining claim, Sims contends that Dr. Obaisi and Dr. Henze violated the Eighth Amendment by failing to rule out contaminated water as the cause of Sims's symptoms and failing to prescribe him free bottled water. (Dkt. 26 ¶¶ 71–80). Requesting summary judgment, Defendants argue that: (1) Sims failed to exhaust administrative remedies; and (2) the doctors gave Sims adequate medical care. (Dkts. 135, 137).[6]

### I. Administrative Exhaustion

Before filing a federal lawsuit, prisoners must exhaust available administrative remedies. *Miles v. Anton*, 42 F.4th 777, 780 (7th Cir. 2022); 42 U.S.C. § 1997e(a). The requirement is mandatory: "a court may not excuse a failure to exhaust." *Ross v. Blake*, 578 U.S. 632, 639 (2016). Grievances "[allow prisons] to address [issues] before being subjected to suit, [reduce] litigation to the extent complaints are satisfactorily resolved, and [improve] litigation that does occur by leading to the preparation of a useful record." *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)); *see also Lockett v. Bonson*, 937 F.3d 1016, 1027 (7th Cir. 2019) ("[T]he primary purpose of the exhaustion doctrine [is to] alert[] the prison officials to the existence of the problem and afford[] an opportunity to repair the injury."). Giving "early notice to those who might later be sued" is not a leading purpose for exhaustion. *Maddox*, 655 F.3d at 722 (citing *Jones*, 549 U.S. at 219). The exhaustion requirement, although strict, "is an affirmative defense, which the defendants bear the burden of proving." *Wallace v. Baldwin*, 55 F.4th 535, 544 (7th Cir. 2022) (quoting *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011)).

---

[6] Defendants also argue—and Sims concedes—that Sims has not produced any evidence to support his claim against the John Doe Defendants. (Dkt. 137 at 14; Dkt. 142 at 15 n.2). So Count II fails as to the John Doe Defendants. Defendants argue further that punitive damages would be an improper remedy for Dr. Obaisi's alleged conduct because he is no longer alive, which Sims also concedes. (Dkt. 137 at 15; Dkt. 142 at 15 n.2). The remedy is a moot point, however, because Count II is deficient in its entirety, as explained below.

"To exhaust available remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). This includes time limits. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) (citing *Artuz v. Bennett*, 531 U.S. 4, 9–10 & n.2 (2000)). An IDOC inmate must follow the grievance process that Illinois law sets out in 20 Ill. Admin. Code §§ 504.800 *et seq. See Maddox*, 655 F.3d at 721 (citing *Jones*, 549 U.S. at 218). The Code requires inmates to file a grievance "within 60 days after the discovery of the incident, occurrence or problem that gives rise to the grievance." 20 Ill. Admin. Code § 504.810(a). When a prisoner is unhappy with the grievance officer's response, he may appeal the decision in writing to the Director, through the ARB, within 30 days. *Id.* § 504.850(a). Grievances must "contain factual details regarding each aspect of the [inmate's] complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint." *Id.* § 504.810(c). At minimum, a grievance must provide enough information to identify the actors involved. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014).

In Sims's August 14, 2017 medical-treatment grievance, he did not complain of any conduct by Dr. Obaisi in the preceding 60 days. Rather, his grievance described Dr. Obaisi's purported refusal to order an MRI in late 2016—with no mention of any more recent acts. Nor is there any evidence on the record that Dr. Obaisi saw or treated Sims in the 60 days before August 14. Sims's last documented visit with Dr. Obaisi before filing his grievance was on May 2, 2017, more than 100 days earlier.[7] Although the grievance officer denied Sims's grievance on the merits, the ARB affirmed the denial on timeliness grounds. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th

---

[7] On July 30, 2017, Sims requested a visit with Dr. Obaisi, and the doctor did not see him during the next two weeks. Sims therefore contends that his grievance complained of Dr. Obaisi's "acts or omissions" within the preceding 60 days. (Dkt. 142 at 12). Not so. Sims's grievance did not center on a delay in treatment, and neither does this lawsuit. So Sims's request to see Dr. Obaisi within the 60-day window is irrelevant.

11

Cir. 2006) (observing that if a prisoner fails to "properly use the prison's grievance process . . . , the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." (citing *Pozo*, 286 F.3d at 1025)). Because Sims failed to timely file his grievance according to the prison's rules, his claim appears unexhausted.

Resisting this conclusion, Sims points out that "prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) (collecting cases). Sims tries to reframe his grievance as a challenge to Dr. Obaisi's—and later, Dr. Henze's— continuous failure to determine whether the water in Sims's cell was making him sick. In this way, he also aims to sidestep the general rule against the "sue first, exhaust later" approach. *See Chambers v. Sood*, 956 F.3d 979, 984 (7th Cir. 2020) (citing *Ford v. Johnson*, 362 F.3d 395, 398– 401 (7th Cir. 2004)); *see also, e.g.*, *Anderson v. Larry*, 2022 WL 17357434, at *11 (N.D. Ill. Dec. 1, 2022) (explaining that grievances "cannot exhaust administrative remedies for actions that happen after they are filed" (internal quotation omitted)). That problem is most glaring with respect to Dr. Henze, who did not treat Sims until more than one year after he filed the grievance.

Yet, the continuing-violation doctrine is not without limits. *Cf. Ramirez v. Young*, 906 F.3d 530, 539 (7th Cir. 2018) ("[M]any people assert that problems are ongoing, when the issue really stems from a discrete act that starts the clock running."). Sims leans on *Turley*, where the inmate's grievance complained of frequent, unnecessary lockdowns. *Turley*, 729 F.3d at 648. The Seventh Circuit held that the grievance exhausted the inmate's federal claims arising from the same alleged lockdown policy. *Id.* at 648, 650. From *Turley*, the key inquiry emerges: whether an inmate's grievance gave the prison notice of the same ongoing policy that the federal lawsuit challenges and a chance to correct course. *See id.* at 650 ("Turley's complaints centered around continuing

prison policies, including allegedly illegal lockdowns, and one occurrence of notice from Turley was sufficient to give the prison a chance to correct the problems."). Here, the answer is no.

According to Sims, his grievance put prison officials on notice that Dr. Obaisi's failure to adequately treat his symptoms caused a "recurrent" injury, thus, excusing the untimely grievance. (Dkt. 142 at 13–14; *see* Dkt. 143-11 at 2 (complaining of "recurrent nausea and dizziness")). Yet, there is a difference between recurrent symptoms and a continuous failure to determine whether those symptoms stem from a particular cause—here, discolored water. If any policy or pattern was apparent from Sims's grievance, a systematic failure to prescribe bottled water was not it. Sims's grievance mentioned that on May 28, 2014, he suffered from nausea and vomiting after eating breakfast and drinking the sink water in his cell. That ended the grievance's discussion of the water. The grievance went on to list several instances over the next two years when Sims sought treatment from Dr. Obaisi for nausea, vomiting, dizziness, or some combination of those symptoms. Each time, Dr. Obaisi prescribed different medications. Later, the doctor allegedly refused to order an MRI. The grievance concluded: "Even with shooting pains and blurred vision and nothing to help me, is a continuing violation of my rights to medical care." (Dkt. 143-11 at 3).

That concluding sentence could put prison officials on notice of a continuous failure to treat Sims's chronic symptoms. But Sims's deliberate-indifference claim challenges a more specific failure. The grievance does not hint that Dr. Obaisi failed to rule out the water in Sims's cell as the root of his illness—any more than it might suggest that Dr. Obaisi failed to determine whether Sims was allergic to the breakfast he ate on the morning of May 28, 2014. *Cf. Ruiz v. Butalid*, 2022 WL 1683352, at *2 (7th Cir. Nov. 9, 2022) (affirming that a grievance complaining about a doctor "who did not dress some wounds" and "Wexford's lack of 'professionalism'" did not exhaust the prisoner's claim "that a disregard of his health conditions, and Wexford's 'cost

cutting,' led to his cardiac arrest"); *see also, e.g.*, *Watford v. Newbold*, 2022 WL 485222, at *3 (7th Cir. Feb. 17, 2022) ("[U]nlike *Turley*, . . . Watford's grievance complained about dental staff concealing what he believed to be a cavity between April 2014 and May 2016—a timeline that predates [the defendant-dentist's] treatment of him."), *reh'g en banc denied*, 2022 WL 1434664 (7th Cir. May 5, 2022). Nor did Sims's grievance ask for bottled water or request any other remedy relating to the water in his cell. Sims's only request was for an MRI. In contrast to *Turley*, Sims's grievance did not put prison officials on notice of the same ongoing failure he now challenges in his lawsuit. Thus, Sims has failed to exhaust administrative remedies.

**II.     Deliberate Indifference**

Exhaustion aside, Sims's deliberate-indifference claim fails on the merits. The Eighth Amendment prohibits "cruel and unusual punishments." *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (quoting U.S. Const. amend. VIII). That prohibition extends to "deliberate indifference to serious medical needs of prisoners" which amount to "the unnecessary and wanton infliction of pain." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 678–79 (7th Cir. 2023) (quoting *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022)); *Estelle v. Gamble*, 429 U.S. 97, 2014 (1976). There is no dispute over the seriousness of Sims's medical condition. (*See* Dkt. 145 at 5). So the question is whether a reasonable juror could find that Dr. Obaisi and Dr. Henze were deliberately indifferent in treating Sims's conditions, and the inadequate treatment harmed him. *Arce*, 75 F.4th at 679 (citing *Stockton*, 44 F.4th at 614).

To survive summary judgment on his deliberate-indifference claim, Sims's evidence must show "[s]omething more than negligence or even malpractice." *Id.* (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). The standard is difficult to satisfy where, as here, the plaintiff has received "at least some treatment." *Id.* Yet, a plaintiff may establish deliberate indifference if

14

the defendant's treatment decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* (quoting *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019)); *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). Put differently, a plaintiff can only prove that the defendant disregarded a serious medical need "if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Johnson*, 936 F.3d at 707 (quoting *Collignon*, 163 F.3d at 989). Sims fails to make such a showing.

There is no question that Dr. Obaisi and Dr. Henze each made efforts to diagnose and treat Sims's symptoms. They prescribed various medications and renewed prescriptions when the medications were helping. The doctors ordered extensive tests: a complete blood panel, a complete metabolic panel, an x-ray, VNG testing, an MRI, an MRA, and a lead test. Further, they referred Sims to several outside specialists, including an ENT specialist, a neurologist, a headache specialist, and a physical therapist. The exact cause of Sims's chronic symptoms still evaded all these doctors. Despite this seemingly thorough treatment history, Sims contends that Dr. Obaisi unjustifiably "ignore[d] Sims's complaints about the sink water." (Dkt. 142 at 8). And pointing to Dr. Henze's testimony that she could not prescribe bottled water due to a prison policy, Sims argues that she abandonment her medical judgment in reliance on the Warden's lay judgment. (*Id.* at 9).

Setting aside Sims's own speculation, he leans for support on the opinion of his retained expert, Dr. Brown, that Sims's symptoms "*could have*" been water related. (Dkt. 136-9 at 10–11 (emphasis added)). This expert testimony could not support a reasonable jury finding that the sink water in Sims's cell, in fact, caused his chronic illness. *Cf. Arce*, 75 F.4th at 679 ("Defendants

15

cannot be held liable for failing to diagnose Arce with a condition unless there is at least some evidence upon which a reasonable jury could conclude that Arce had it."). Nor could Dr. Brown's testimony convince a reasonable jury that any "minimally competent" doctor under the circumstances would have explored Sims's water complaints further or prescribed him bottled water. *See Johnson*, 936 F.3d at 707.

Contrary to Defendants' expert, Dr. Brown has judged Dr. Obaisi's and Dr. Henze's treatment inadequate. Critically, a mere "difference of opinion" by dueling experts—even if suggestive of negligence or medical malpractice—is not enough to demonstrate deliberate indifference. *Murphy v. Wexford Health Sources*, 962 F.3d 911, 916 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc) ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." (citing *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996)). In short, Sims has submitted no evidence permitting a reasonable jury to determine that Dr. Obaisi or Dr. Henze treated him with deliberate indifference. Accordingly, Sims's claim in Count II cannot survive.

## CONCLUSION

For the reasons above, the Defendants' motion for summary judgment [135] is granted.

_____
Virginia M. Kendall
United States District Judge

Date: September 29, 2023